# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CINDY C. IRONS, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> VILLAGE OF DOLTON, a municipal ) <br> corporation, MARLON HARRIS, LEWIS ) <br> LACEY, and JOEL McQUEEN, ) <br> ) <br> Defendants. ) <br> ) | No. 15 C 04315 <br><br> Judge John J. Tharp, Jr. |

## MEMORANDUM OPINION AND ORDER

Plaintiff Cindy C. Irons sues the Village of Dolton and three of its police officers in connection with her arrest at her daughter's high school in April 2015. The Amended Complaint alleges three Counts and seeks compensatory and punitive damages. Though the Complaint itself does not identify the bases for those Counts with perfect clarity, Irons asserts in her Response brief—and language in the Complaint supports her assertions—that Count I brings a state law claim for false arrest and imprisonment against the three officers (and the Village of Dolton based on the theory of *respondeat superior*); Count II asserts a state law claim for battery, again against the three officers and the Village as their employer; and Count III brings a claim pursuant to 42 U.S.C. § 1983 for violation of her rights under the Fourth and Fourteenth Amendments against the three officers only, both in their individual and official capacities. *See* Am. Compl., ECF No. 15; Pl. Resp. at 2, ECF No. 56. Defendant Lewis Lacey seeks summary judgment in his favor as to all three Counts. Defendant Marlon Harris seeks summary judgment in his favor on Count II, and on the excessive force component of Count III. Defendant Joel McQueen seeks summary judgment as to Irons' false arrest claims, and further argues that any claims Irons

brings against him in his official capacity must be dismissed as redundant of Irons' claims against the Village.

The issue of whether the police officer defendants had probable cause to arrest Irons is riddled with material questions of fact that impact all of Irons' claims. Because of that pervasive factual problem, the defendants' Motions for Summary Judgment largely fail. Lacey is granted summary judgment only as to Count II and the excessive force component of Count III. In all other respects, the Motions are denied.

## BACKROUND

This story begins at Thornridge High School. On April 23, 2015, Plaintiff Cindy Irons drove her daughter the school, dropping her off between 7:00 and 7:15 a.m. Harris and Lacey's Statement of Facts ("Defs. SOF") ¶ 1, ECF No. 49; *see also* McQueen SOF ¶ 1, ECF No. 46. Shortly thereafter, Shavona called Irons in a panic to say that other girls had "tried to jump on me" and that she had just been involved in a fight. Irons Dep., 18:7-10, Apr. 28, 2016, ECF No. 46-1; Defs. SOF ¶ 2; McQueen SOF ¶ 3. Irons returned to the school, where she met with Shavona and Steve Valant, a school administrator, in Valant's office area. Defs. SOF ¶ 3. Irons' daughter had previously told Irons, before Irons arrived back at the school, that she had been suspended for ten days as a result of the fight, and Irons asked Valant upon her arrival why her daughter had been "suspended for defending herself." Irons Dep., 26-28; *see also* Defs. SOF ¶ 3; McQueen SOF ¶¶ 5-6. While Irons was talking to Valant, she also had her phone to her ear with her own mother on the line. Irons Dep., 29:17-20; Defs. SOF ¶ 4.

Three uniformed police officers—defendants Harris, Lacey, and McQueen—then arrived and entered the inner office where Irons, Shavona, and Valant were gathered. Defs. SOF ¶ 5. Officer McQueen testified at his deposition in this case that when he arrived at the school, he

heard "[l]ots of shouting, yelling, [and] profanities." McQueen Dep., 54:22-23, May 12, 2016, ECF No. 46-2; McQueen SOF ¶ 8. Irons denies the accuracy of that description; she testified at her own deposition that she was not angry when she asked Valant about the suspension but that she then "got angry when the police came." Irons Dep. 28:20-22; *see also* Pl. Resp. to Defs. SOF ¶ 8, ECF No. 57. Lacey asked Irons for her name, to which Irons replied, "Cindy," while she still had her own mother on the phone. Defs. SOF ¶ 6. Irons then hung up with her mother, saying she would call her back, and gave the officers her last name. Defs. SOF ¶ 7. Irons and the officers left Valant's inner office and moved into the administrative outer office. *Id.* Lacey asked Irons to step out into the hallway with Harris and McQueen, which Irons did; Lacey, meanwhile, remained in Valant's office. Defs. SOF ¶ 9; McQueen SOF ¶ 11. Irons began complaining about the fact that Lacey and Valant were now in the office meeting with Shavona without Irons. Defs. SOF ¶ 10. At some point, Irons resumed her phone conversation with her mother and told her that, "they've got her in there by herself and they're questioning her and they've got me out here in the hallway." *Id.* ¶ 11; *see also* Irons Dep. 41:2-5.

Harris told Irons to get off the phone, but Irons instead stepped into the girls' bathroom, where she continued her phone conversation. Defs. SOF ¶ 12. When Irons came out of the bathroom, Harris said to her, "Didn't I tell you to hang up your phone?" *Id.* ¶ 14. Irons responded that she did not have to hang up her phone, that she was "grown," and that Harris did not pay her bill. *Id.* Irons admits that she was probably "pretty loud" when she told Harris, "You don't pay my bill." Pl. Resp. to Defs. SOF; Irons Dep. 46:22-23. At that point, while standing in the hallway in front of the door to Valant's office area, Harris grabbed Irons' arm and told her she was under arrest. Defs. SOF ¶ 15. Harris began to handcuff Irons' left arm while Irons held her phone in her right hand. *Id.* ¶ 16. McQueen had been in the restroom during the start of the arrest

process, but now emerged from the restroom, grabbed Irons' right arm and brought it behind her, and said that Irons was resisting arrest, a point Irons disputed. *Id.*; McQueen SOF ¶ 22; Irons Dep. 48:15-22. McQueen also took Irons' phone out of her right hand. Defs. SOF ¶ 19. Harris completed handcuffing Irons' left hand, but Irons is not sure who completed cuffing her right hand. McQueen SOF ¶¶ 23-24.

Lacey then came into the hallway, and Harris and McQueen walked Irons down the hallway. *Id.* ¶ 25; Defs. SOF ¶ 21. Lacey never touched Irons. Defs. SOF ¶ 21. Irons testified that there was nothing painful about "what Harris was doing," but also testified that McQueen was holding her right arm too tightly, and that McQueen held her arm the entire walk from the school building to the police squad car that was parked outside. Defs. SOF ¶¶ 23-24; Irons Dep. 56:5–57:16. Irons testified that McQueen exerted "[a] lot of pressure" and that "[i]t was painful." Irons Dep. 56:17-21. The defendants all deny that McQueen exerted too much pressure or caused Irons pain. McQueen Resp. to Pl. SOF ¶ 5, ECF No. 69; Defs. Resp. to Pl. SOF ¶ 5, ECF No. 67. Once outside and near the squad car, Harris told Irons, "[Y]ou just need to calm down, because your daughter is in there, you need to get back to her." Defs. SOF ¶ 25; Irons Dep. 60:4-6.

Either Harris or McQueen asked Irons for her driver's license, and after Irons indicated to that the license was in her jacket pocket, Harris removed it and handed it to McQueen. Defs. SOF ¶ 26; Pl. Resp. to Defs. SOF ¶ 26. At some point, Irons sat in the back of the squad car, with the door left open and her feet still outside the vehicle. Defs. SOF ¶ 27; Pl. Resp. to Defs. SOF ¶ 27. Lacey then joined the other officers and Irons, and instructed Harris to remove the handcuffs from Irons, which Harris did. Defs. SOF ¶ 28; McQueen SOF ¶ 28. Lacey told Irons that she needed to calm down, and that Harris was going to issue her a ticket for disorderly conduct because she was "too emotional." Defs. SOF ¶ 29; Pl. Resp. to Defs. SOF ¶ 29;

4

McQueen SOF ¶ 29. Irons complained about McQueen's conduct after Harris removed the handcuffs and while Harris was writing out her ticket. Defs. SOF ¶ 30; Pl. Resp. to Defs. SOF ¶ 30. Irons testified that she told Lacey that "he abused me" and that "[h]e had my arm too tight," and testified that she took her jacket off and showed Lacey that her arm was red." Irons Dep. 63:8-14; Pl. SOF ¶ 6.

McQueen was sitting in his squad as Harris wrote out the ticket, and Lacey approached McQueen and spoke to him before McQueen pulled off and drove away. Defs. SOF ¶ 31; McQueen SOF ¶ 30. Irons asked Lacey for McQueen's badge number, which Lacey provided to her. Defs. SOF ¶ 32. Lacey and Harris then left the scene, and Irons returned to the school to retrieve her daughter and speak with Valant about the terms of her suspension. *Id.* Irons then left the school. *Id.* She went to the emergency room at Ingalls Hospital, where she received an X-ray. *Id.* ¶ 33. A doctor told her at the hospital that she had a "sprained [right] arm" in the area of "the upper middle arm between the elbow and shoulder." Irons Dep. 67:8-15; Defs. SOF ¶ 33. Irons also had scratches on her inner arm, and she testified that she believes those scratches resulted from McQueen's hands and fingernails. Irons Dep. 67:16-24; 68:1-7; Pl. Resp. to Defs. SOF ¶ 33. Irons had been wearing a thin jacket at the time of her arrest. Irons Dep. 69:9-10. Irons also visited her own regular physician a few days after the incident, and he told her to continue using ice packs and to take the ibuprofen pain pills that the hospital physician had prescribed for her if she experienced pain. *Id.* 70:15–71:10. Irons admits that Harris did not injure her. Pl. Resp. to Defs. SOF ¶ 35. She also admits that Lacey did not touch her, or "initially place her under arrest," but argues in her filings that he "ratified the charges placed by Harris." *Id.* ¶ 36.

A village hearing officer found against Irons on the disorderly conduct charge. Pl. SOF ¶ 15. Irons then pursued administrative review in the Circuit Court of Cook County, Sixth

5

Municipal District, and a judge in that court found that the charging document was "defective" and that the Village had failed to prove its case at the hearing. *Id.* ¶ 17. That court reversed the ruling against Irons and vacated the $250 fine that the village hearing officer had levied against her. *Id.*

## ANALYSIS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *EEOC v. CVS Pharmacy, Inc.*, 809 F.3d 335, 339 (7th Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). A genuine dispute as to a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cnty.*, 752 F.3d 708, 712 (7th Cir. 2014). When considering a motion for summary judgment, the Court construes the facts and makes all reasonable inferences in favor of the non-moving party. *Jajeh v. Cnty. of Cook*, 678 F.3d 560, 566 (7th Cir. 2012). "[D]istrict courts presiding over summary judgment proceedings may not weigh conflicting evidence . . . or make credibility determinations." *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (internal quotations and citation omitted). Rather, the Court's role is "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).

### I. Constitutional Claims (Count III)

The Court begins its analysis with Count III, the claim asserted under 42 U.S.C. § 1983, which Irons bases on theories of excessive force and arrest without probable cause. *See* Pl. Resp. at 2-3. The Court will consider each theory in turn.

### A. Probable Cause for Arrest

"The existence of probable cause to arrest is an absolute defense to any § 1983 claim against a police officer for false arrest or false imprisonment." *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 713-14 (7th Cir. 2013). There is probable cause that justifies an arrest where "the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Id.* at 714. Though this standard requires something "more than a hunch," probable cause does not require a determination that "it was more likely than not that the arrestee was engaged in criminal activity—the officer's belief that the arrestee was committing a crime need only be reasonable." *Id.* The Court should "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (internal quotations omitted). Still, probable cause "depends not on the facts as an omniscient observer would perceive them but on the facts as they would have appeared to a reasonable person *in the position of the arresting officer*—seeing what he saw, hearing what he heard." *Carmichael v. Vill. of Palatine, Ill.*, 605 F.3d 451, 457 (7th Cir. 2010) (quoting *Mahoney v. Kesery*, 976 F.2d 1054, 1057 (7th Cir.1992) (emphasis in original)). "The existence of probable cause . . . depends, in the first instance, on the elements of the predicate criminal offense(s) as defined by state law." *Abbott*, 705 F.3d at 715.

McQueen cites to Illinois' criminal code provision barring disorderly conduct, which provides that a person commits disorderly conduct when he or she knowingly "[d]oes any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace." 720 ILCS 5/26-1. Irons' brief discusses that statute as well, but also notes that Irons was arrested

for violation of a village ordinance barring disorderly conduct, and it is that ordinance, not the Illinois criminal code, that this Court should consider in evaluating probable cause. The ticket and notice of violation against Irons cited a Violation of Code 5-5-1-1 of the Village of Dolton Code of Ordinances. *See* Compl. for Admin. Rev., ECF No. 58-1. That ordinance provides, in relevant part, that "[i]t shall be unlawful for any person to engage in disorderly conduct or any conduct tending toward a breach of the peace. The causing or making of any unnecessary loud noise and shouting or yelling shall be considered disorderly conduct." *Id.* at 9.[1] This dispute is not material, because if there was probable cause to believe that Irons had violated either the state statute or the Village ordinance, Irons' false arrest claim would fail. *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017) ("We have previously explained that "probable cause to believe that a person has committed *any* crime will preclude a false arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause," citing *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007)).

Whether viewed in the context of the state statute or the Village ordinance, the factual record in this case is not sufficiently developed to enable this Court to determine, as a matter of law, that the defendant officers had probable cause to arrest Irons, and Lacey and McQueen's motions as to this prong of Count III are therefore denied. McQueen, who assisted Harris in arresting Irons, argues that he had probable cause for the arrest because Irons had been loud and angry in a school corridor while school was in session and had not complied with police demands that she hang up her phone. McQueen Mem. at 4, ECF No. 47. But the record fails to paint an undisputed portrait of Irons' demeanor and conduct. McQueen testified at his deposition that he heard "[l]ots of shouting, yelling, [and] profanities" when he arrived at the school. Irons,

---

[1] It is not entirely clear to the Court why Irons advocates consideration of the Village ordinance, which is arguably broader than the state statute.

however, denies the truthfulness of that testimony. Harris testified at the underlying municipal proceedings that he had placed Irons in handcuffs because she had been yelling and he heard her use profanity, and that the disorderly conduct charge was due to her behavior, demeanor, and the "nature of the call." *See* Record of Proceedings at 94-95, ECF No. 58-2; Defs. Resp. to Pl. SOF ¶ 11. The only arguably relevant admissions that Irons makes in this regard is that she did indeed refuse to hang up her phone, and that she was probably "pretty loud" when responding to Harris' demand that she do so.[2] It is unclear, however, whether and when Irons was ever "shouting" or "yelling," or what the content of any such shouting or yelling may have been. To put it simply, the nature of Irons' behavior at the school remains fuzzy, and a definitive finding that the officers had probable cause to arrest her is inappropriate at this time.[3]

Lacey argues, meanwhile, that he is entitled to summary judgment on the probable cause prong of Count III because it is undisputed that he was not involved in arresting or restraining Irons. Defs. Mem. at 5, ECF No. 51. Irons argues in response that it is undisputed that Lacey, a Sergeant, was the supervising officer on the scene. Irons also points to her own deposition testimony that Lacey told her Harris was writing her a ticket because she was too emotional, and

---

[2] Irons makes a fairly extensive argument in her brief that the fact that the disorderly conduct charge was dismissed on administrative review supports a finding that the police officers lacked probable cause to arrest her. See Pl. Resp. at 7-9. Dismissal of a charge does not, however, mean that the charge was unsupported by probable cause. Scruggs v. United States, 929 F.2d 305, 307 (7th Cir.1991) ("Acquittal does not establish the lack of probable cause[.]"). Further, analyzing probable cause does not depend "on the facts as an omniscient observer would perceive them" but instead on what would have appeared to "a reasonable person in the position of the arresting officer." Carmichael, 605 F.3d at 457 (quoting Mahoney, 976 F.2d at 1057 (emphasis in original)).

[3] This uncertainty regarding probable cause also forecloses a grant of summary judgment to McQueen on the basis of qualified immunity. "Often termed 'arguable probable cause,' qualified immunity in this context protects officers who reasonably but mistakenly believe that probable cause exists." *Abbott*, 705 F.3d at 714 (internal citations omitted). Because it is impossible to determine, on the basis of the current record, that the officers had a reasonable belief that probable cause existed, the doctrine of qualified immunity cannot provide a basis for granting McQueen summary judgment.

says these things indicate that Lacey "ratified and agreed with the decision to charge [her] with disorderly conduct." Pl. Resp. at 7.

It is true that supervising government officials "may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Supervisors can be liable, however, where they are "personally responsible for the deprivation of the constitutional right." *Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012) (internal quotations omitted). "To show personal involvement, the supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Id.* (internal quotations omitted). Irons' argument is a bit off-center; any evidence that Lacey ratified and agreed with the decision to write her a ticket does not necessarily bear on whether he ratified and agreed with the decision to arrest her. Lacey did, however, come out into the hallway after the other officers had arrested Irons there, but before McQueen and Harris led her out of the building. As discussed above, a jury could reasonably conclude on the basis of the current record that Irons suffered a constitutional deprivation because Harris and McQueen arrested her without probable cause. Because it remains unclear from the record whether Lacey condoned or approved of her arrest, it remains possible for a reasonable jury to conclude that Lacey would also be liable for any such deprivation.

The Court denies McQueen and Lacey's motions for summary judgment as to the arrest without probable cause portion of Count III.

### B. Excessive Force

Police officers are entitled to use force in appropriate circumstances, but the use of excessive force is unconstitutional. *See Weinmann v. McClone*, 787 F.3d 444, 448 (7th Cir.

2015). In determining whether a use of force is "reasonable" under the Fourth Amendment, courts must perform "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotations omitted). Evaluating whether the degree of force used was excessive "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The reasonableness test is an objective one, but the analysis must allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

Officer McQueen does not seek summary judgment on Irons' excessive force allegations. Irons, in turn, "concedes to dismissal" of Lacey from the excessive force portion of Count III. Resp. at 2. At this stage of the litigation, however, Irons cannot avoid judgment on that claim by voluntarily dismissing it, and in any event has not filed a motion pursuant to Federal Rule of Civil Procedure 41 to do so. Irons has therefore abandoned her excessive force claim against Lacey, and summary judgment in favor of Lacey as to that claim is appropriate.

Harris, then, is the only individual defendant the Court need consider in relation to this claim. Harris argues that he is not liable for excessive force because it is undisputed that he caused Irons no physical harm. Defs. Mem. at 7. The undisputed facts, Harris asserts, reveal that this was "a routine handcuffing and escort" and that no constitutional violation occurred. *Id.* In her response, Irons argues that Harris' use of force was excessive in light of the fact that she was only charged with disorderly conduct under a municipal ordinance. *See* Pl. Resp. at 14. This was

not a severe crime, Irons argues, adding that there is no evidence that she posed a threat to anyone's safety and that Harris' handcuffing and contact with her was therefore not objectively reasonable under the circumstances. *Id.* at 13-14.

The Supreme Court "has long recognized that the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396. But that privilege evaporates if the arrest itself is unlawful, as the Seventh Circuit has made clear:

> [W]hen an illegal arrest sets off a chain of indignities inflicted on the hapless victim, including offensive physical touchings that would be privileged if the arrest were lawful, she is entitled to obtain damages for these indignities whether or not they are independent violations of the Constitution. For they are foreseeable consequences of the illegal arrest, and the ordinary rules of tort causation apply to constitutional tort suits.

*Herzog v. Vill. of Winnetka, Ill.*, 309 F.3d 1041, 1044 (7th Cir. 2002); *see also Williams v. Sirmons*, 307 Fed. App'x 354, 360 (11th Cir. 2009) ("If no probable cause authorizes an arrest, any use of force to effectuate the unlawful arrest is a violation of the Fourth Amendment."). If a jury finds that Harris' arrest of Irons was unlawful because he lacked probable cause, then *any* force Harris used to effectuate that unlawful arrest—including the allegedly offensive contact he made when he grabbed Irons arm to bring it behind her back—would violate the Constitution. Because of this Court's finding that there are material factual disputes regarding probable cause, therefore, summary judgment is also denied to Harris as to the excessive force claim.

**II. False Arrest and False Imprisonment Under State Law (Count I)**

Irons also alleges that the police officers' conduct constituted false arrest and false imprisonment under state law. In Illinois, the elements of a cause of action for false arrest or false imprisonment are: "(1) that the plaintiff was restrained or arrested by the defendant; and (2)

that the defendant acted without reasonable grounds (i.e., without probable cause) to believe that an offense was committed by the plaintiff." *Grainger v. Harrah's Casino*, 18 N.E.3d 265, 276 (Ill. App. Ct. 2014). "For purposes of state-law false imprisonment claims, probable cause is defined as a state of facts which, if known, would lead a person of ordinary caution and prudence to believe or entertain a strong and honest suspicion that the person arrested is guilty." *Id.* at 276 (internal quotations omitted). Harris does not seek summary judgment as to Count I, but both McQueen and Lacey do.

This Court has already determined that material factual issues exist regarding the question of probable cause to arrest Irons for disorderly conduct. Because probable cause is a required element of false arrest and false imprisonment claims, summary judgment is denied to those two officers as to Count I.

### III. Battery Under State Law (Count II)

The Court next turns to the battery claim Irons brings in Count II. McQueen's motion does not seek summary judgment on the battery claim, so this Opinion's discussion is limited to Lacey and Harris. Irons again "concedes to dismissal" of Lacey from Count II. Irons has actually abandoned this claim against Lacey in the same way she abandoned her constitutional excessive force claim against that defendant. Summary judgment in favor of Lacey as to Count II is therefore appropriate.

That leaves Harris, who argues that he is entitled to summary judgment on the battery claim in Count II because that claim is barred by the Illinois Local Governmental and Governmental Employees Tort Immunity Act ("TIA"), and alternatively, because Irons herself has admitted that Harris did not cause a harmful contact. Defs. Mem. at 6. Section 2-202 of the TIA, 745 ILCS 10/1–101 *et seq.*, provides, in relevant part that "[a] public employee is not liable

13

for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2–202. That statute defines "willful and wanton conduct" as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1–210. "Although willful and wanton conduct consists of more than mere inadvertence, incompetence, or unskillfulness, it need not be an intentional act; rather, it may be an act committed under circumstances exhibiting a reckless disregard for the safety of others." *Chelios v. Heavener*, 5250 F.3d 678, 693 (7th Cir. 2008) (quoting *Carter v. Chi. Police Officers*, 165 F.3d 1071, 1080–81 (7th Cir. 1998)) (internal quotations omitted). While the question of "whether conduct is willful and wanton is ultimately a question for the jury," it is "within a court's province . . . to hold as a matter of law that an officer's actions did not amount to willful and wanton conduct when no other contrary conclusion can be drawn." *Fatigato v. Vill. of Olympia Fields,* 666 N.E.2d 732, 739-40 (Ill. App. Ct. 1996).

Harris argues that the battery claim is barred by the TIA because his conduct was not willful and wanton. Irons has admitted that Harris did not inflict any pain on her and did not injure her, Harris argues. Harris also challenges Irons' argument that the statutory immunity does not apply because the subsequent overturning of her ordinance violation indicates he was not "enforcing a law." If that were the case, Harris asserts, police officers would be subject to tort claims every time an arrestee ends up not being convicted.

This Court cannot conclude on the basis of the present record that Harris is immune from Irons' battery claim under the TIA. It is true that there is no evidence before the Court that suggests Harris' conduct was willful and wanton; the record only indicates that Harris "grabbed"

14

Irons' arm, took Irons' hand behind her back to handcuff her, and escorted her out of the building. Irons admits that Harris' conduct did not cause her any pain, and there is nothing else in the record to support a finding that Harris had an "actual or deliberate intention to cause harm" or that he was indifferent to or consciously disregarded Irons' safety. But Irons argues that Harris was not "enforcing the law" as required for TIA immunity to apply. She asserts that because there "is no indication" that Irons violated any law—pointing in part to the municipality's finding that the disorderly conduct ticket was defective and she need not pay the fine—her arrest was a false one, and that Harris was therefore not acting in the execution or enforcement of any law. Pl. Resp. at 12-13. Irons' brief fails to cite a single case to support this proposition. Still, this Court concludes that because a jury could find that Harris was conducting an *unlawful* arrest for which he lacked probable cause, applying TIA immunity to Harris would be inappropriate at this stage of the case.

Irons argues that the basis for her battery claim against Harris is that he caused an offensive and unpermitted touching when he grabbed her arm and brought it behind her to handcuff. *See* Pl. Resp. at 12. It is true that under Illinois common law, battery "is the unauthorized touching of another person." *Luss v. Vill. of Forest Park*, 878 N.E.2d 1193, 1206 (Ill. App. Ct. 2007). "To be liable for battery, the defendant must have done some affirmative act intended to cause an unpermitted contact." *Campbell v. A.C. Equipment Services Corp., Inc.*, 610 N.E.2d 745, 748 (Ill. App. Ct. 1993) (quoting *Gaskin v. Goldwasser*, 520 N.E.2d 1085, 1094 (Ill. App. Ct. 1988)). As this Opinion has already noted, a police officer making a lawful arrest may use reasonable force to effect that arrest, and in those circumstances Harris' contact with Irons would not support a claim for battery. But this Court must note once again that disputes of material fact remain regarding whether Harris had probable cause to arrest Irons. As the Seventh

15

Circuit has recognized: "Any intentional offensive physical touching is a battery unless privileged. That is the character of a false arrest in which the arrested person is physically seized." *Herzog*, 309 F.3d at 1044.

Summary judgment is therefore denied to Harris as to Count II.

**IV. Village and Official Capacity Claims**

Irons also brings her state law claims in Counts I and II against the Village under a theory of *respondeat superior*. The Village's request for summary judgment as to these counts is denied because the Village's arguments are undeveloped. *See* Defs. Mem. at 8. Arguments that are "perfunctory and undeveloped" are waived. *Argyropoulos v. City of Alton*, 539 F.3d 724, 738 (7th Cir. 2008).

McQueen's bid for summary judgment as to any claims Irons brings against him in his official capacity is also denied. Only Count III names the officers in both their individual and official capacities. "An official capacity claim against an individual defendant constitutes a claim against the government entity itself." *Gossmeyer v. McDonald*, 128 F.3d 481, 494 (7th Cir. 1997). The portion of Count III that Irons brings against the officers in their official capacities is, therefore, essentially a claim against the Village itself. *See Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1071 (7th Cir. 2012) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n. 55 (1978)). Claims brought pursuant to § 1983 "may be brought against municipalities and other local governmental entities for actions by its employees only if those actions were taken pursuant to an unconstitutional policy or custom." *Id.* (citing Monell, 436 U.S. at 694). McQueen raises no arguments regarding the lack of evidence of any such policy or custom, but instead merely states that the official-capacity claim against him is redundant of the claims against the Village. *See* McQueen Mem. at 6. But the claim is not redundant because Irons does not name the Village in

Count III. Because McQueen has failed to develop any other arguments regarding the official-capacity claim, his motion in that regard is denied.

<center>*   *   *</center>

Sergeant Lacey is granted summary judgment only as to Count II and the excessive force component of Count III. In all other respects, the Motions for Summary Judgment are denied.

Date: September 5, 2017

_____
John J. Tharp, Jr.
United States District Judge